First matter this morning are the consolidated cases 4-16-0604 and 4-16-0605 in re Carol B. Appearing for appellant is attorney, is it Kelly Choate? Choate, yes. Okay, thank you. And for the appellee, Rosario Escalera. Good morning, counsel. Good morning. Ms. Choate, are you ready to proceed? I am. You may. Thank you. May it please the court? I'm Kelly Choate and I work for the Guardianship and Advocacy Commission for the State of Illinois. Their legal advocacy service. And I'm here representing the respondent appellant, Carol B. The main question in this case is whether violation of Section 107 of the Mental Health and Developmental Disabilities Code would require reversal of the commitment and involuntary treatment petitions and hearings that came after. And additionally in this case, whether a psychiatrist's failure to give written information about the risks and benefits of the proposed treatment to Carol prior to that treatment being started, whether that is also a violation that would require reversal. Mental health, mentally ill people have a fundamental right to refuse medication. It's intrusive. It can change your blood chemistry, your brain chemistry. And it can be permanent. It can be damaging. It can cause death. In this case, we're not only talking about psychotropic medications, but we're talking about electroconvulsive therapy. Electroconvulsive therapy is also known as ECT. And what happens in ECT, the patient is taken to a room, put on a gurney, an IV is started. That person is given, they have an EKG machine there. They have an anesthetist, a psychiatrist, some nurses. The person is given an IV. They're given an anesthesia. They're also given a muscle paralytic so that when the electricity is run through their brain, their body doesn't jump around on the table and cause more harm than would be causing. They could have broken bones. But the paralytic does stop some of that. This is a very invasive treatment. Ms. Schultz, can I ask you, is it Schultz? Schultz. Schultz, okay. Ms. Schultz, I have a question because we have two things here, right? We have the admission and then we have the medication. And I'm interested in you expounding on your argument as it relates to how the admission, there was somehow a problem with the admission because of what occurred that we should reverse. I mean, even if we didn't consider the medication issue. Is that your position, that even if we didn't get to the medication issue, there's a basis to reverse just based on the admission and what occurred? Yes. Our position is that much like in the criminal context, the fruit of a poisonous tree doctrine, what was done to Carol B. in this case was such an egregious violation of her rights that anything that came after, whether it be the hearing on the commitment or the hearing on the medication, both those were held on the same day. Those were both so tainted by what had happened to her in the month prior that it would require reversal. And I know from the record there doesn't seem to be any disagreement that her hearing was held in a timely fashion, which sounds pretty scary given that she was, you know, there over a month before she even had a hearing on the admission. But is that true? Is that accurate? Well, what happened in this case was Carol B. was admitted specifically to get a course of ECT. She was at Broman Hospital, and they don't have the capacity to do the treatment. So she was sent to Memorial Medical Center. How long was she at Broman? I don't know that. Because I couldn't determine that. Right. I don't think the record was clear on that, and I don't know that either. Okay. But she did come to Memorial on June 18th of 2016. Because Broman doesn't do the ECT. Right. But you're saying that she went to Broman specifically for ECT? She came to Memorial specifically. Broman couldn't do it. The doctors had been not happy with the medication regimen she'd been on. They weren't as effective as they had hoped. So they wanted her to have ECT. She had had ECT in the past, and the doctors at Broman felt that she could have another course of ECT. Do we know if she was at Broman voluntarily? I do not know that. I would suspect she was not, because from the first day she was at Memorial, her psychiatrist, Dr. Reddy, said she had no capacity to consent. Right. So she had no capacity to consent to being there. She had no capacity to consent to treatment. But from June 18th through June 20th, she was treated. She was given medication. ECT was planned. She was given medication. What about the different petitions? I was confused by the procedural history in this, and I don't understand the various filings. There was a petition for involuntary commitment filed on June 20th, and then another one filed on July 12th. And then there are two separate petitions also relating to the medication, the involuntary treatment part of it. Is the record clear as to what happened with those initial petitions and why subsequent petitions were filed? The record is clear as to what happened to the medication petition. The first medication petition, and I represented Carol Below, so I was involved in this. The first medication petition that was filed on June 22nd did not have a factual basis for why they wanted to do the treatment, and that's a requirement on the petition. I raised that with the state's attorney's office, and usually what we would do is allow them to amend. We're not trying to trick anybody. We want the rules to be followed. We want everyone to have a fair hearing. We want our person to get treated if they need it, and it's legal. And so I raised that with the state's attorney's office. Subsequently, they didn't amend. They withdrew both petitions, although we had not complained about the commitment petition that was filed on the 20th of June, they withdrew both. And for some reason, and I do not know, it's not in the record, nobody testified to that fact, why the delay? We don't know why they delayed until July 12th for the second commitment petition and July 13th for the second treatment petition. Because by that time, she had been on medication from the 18th, including the first day she was there, an Ativan challenge, to see if she was really catatonic, is what the doctor, I think, testified to. And so she has given this Ativan. She was maintained on medication she'd been on before, and then he added other meds, a couple other medications, between the time she came and the time that the petition was heard. Also, she was given ECT, eight treatments. And this lady was resisting these treatments. She didn't want to go. She's resistive. She's curled up in a fetal position on that gurney while they're trying to get her ready for ECT. She's resistive of the needle stick. And none of this, the doctor admitted at no time, was she at imminent risk of serious physical harm. And that under 107 is the criteria for giving anybody psychiatric treatment against their will when they have no capacity. So even if she had consented, she had no capacity to consent. Well, they actually had someone from the ethics committee at the hospital come in and even speak with her, I'm assuming, to determine whether or not she had the capacity to consent. Is that correct? That is correct. Because they were trying to get the husband to be her power of attorney for health care. And the doctor was concerned because he knew from the beginning that she didn't have capacity. And so he was afraid she would not have capacity to consent to a power of attorney. And so that's why they called in the ethics person or panel on two separate occasions, I believe the record reflects. And on both occasions they said, no, that she does not have the capacity. So she doesn't have a POA. She didn't have a mental health declaration. And yet the hospital continued to treat her husband as if he was somehow her POA by getting consent from him over the phone for the ECT. And specifically you're referring to 107A where basically it states that you can't just give medication treatment to someone when they can't consent unless, and before you've had a hearing and the judge has entered an order, unless it's necessary to prevent the person from causing serious and imminent physical harm to him or herself or someone else. Right. And no lesser restrictive means is available. So that's a two-parter. And here she was never at any risk. The doctor, and I'm not saying at all that the doctors aren't trying to do the right thing. He wanted to do the right thing by her medically. But they did not do the right thing by her legally. The trial court, it's quoted in page 13 of the Apolese brief, found, quote, not that Ms. Baker will harm others but that she is not able to function on her own and that her passive thoughts put her in a position where she could potentially harm herself, close quote. What evidence was there that would support that statement that she could potentially harm herself? My understanding from the judge's ruling, and that also is a 107-1 ruling, for treatment, not for emergency intervention. But the doctor had said she was, had catatonia, was not feeding herself. Well, as the record went on, we found out she really was eating. She could eat by herself. She could eat with support of staff. She lost five pounds over the month she was there. She was never at any danger. She never harmed anyone else. But because of her inability to care for herself without the assistance of others, that's my understanding of what harm she could cause. And that's for the treatment. It's a lesser standard, certainly. She doesn't have to be at imminent risk. She should just be not able to care for herself without the medications. And the judge decided that she needed these interventions to help her either maintain or to improve her mental abilities. She had other problems. She was also possible dementia. She was taking Aricept for that. And one of the problems in this case is that there are black box warnings on these drugs for people who are elderly. She was 60, in her 60s, and who have dementia. They're at higher risk for a lot of problems with these drugs, including increased depression, which happened to her. So the problem that we're coming to you for is to find out what happens when 107 is violated to such a degree. Can this lady have a fair hearing? And you mean 107A because we've got 107.1. Right, 107, the emergency portion of the code. And absolutely, if someone's banging their head against the wall or coming at another patient or staff with their fist raised and they're going to deck somebody, that would be a situation where it would be appropriate. And if you can't maybe seclude them or remove them from the situation, which would be a lesser restrictive. In this case, they treated her for a month. They gave her ECT, which can cause short-term memory loss, loss of cognition, so you can't learn during the times of the treatments. The medication can cause problems, increase depression. And this lady never had passive death wishes. She wasn't actively suicidal, but she was wishing she could die. She was apathetic. She felt like the ECT was frying her brain. Why do I have to do this if I don't want it? She was worse. The doctor thinks she was getting better, but her depression, for want of a better word, was worse. She would not even come to her hearing. Would she have come before? Would she have come the day if she had been as she came on the 18th at the doctor and said that she felt happy? We don't know because the hospital and the physicians treated her that whole time and ECT. And our position is that that is such an egregious violation that it does require reversal. And the violations that I noted in my brief are procedural violations. Many of those weren't reversal. But here's this massive, to the heart of the matter, violation, and nothing happens. They file a new petition. The two new petitions were done okay, except they were almost a month late. So our question to you, and we're asking you to rule that an egregious violation like this, and frankly any violation of 107, any medication, any ECT given when it is not lawful, should warrant a reversal. And that would give the hospitals, because they want to do the right thing. They want to get the petitions right. Sometimes they don't. They want to because they want to treat the folks. They want to treat their patients. Finding that this would warrant a reversal would go a long way to stopping this behavior under 107. Do you have no other questions? I don't see any. Thank you. Thank you, Ms. Schuch. Mr. Espelar. May it please the Court, Counsel. Good morning, Your Honors. I am Rosario Espelar, and I represent the Appellate Prosecutor's Office here in Springfield. I will begin with the involuntary commitment case. I will refer to this as Case 363. As Counsel said, it was so tainted, but the issue, the violation of 107 has nothing to do with the commitment case at all. The violation occurred because of the medication, and the medication has nothing to do with involuntary commitments. And the respondent argues that this case is not moved for the two exceptions. However, as I said, the first exception is the public interest exception. Yet, none of those, the respondent has the burden to prove all three, yet she's unable to prove those three requirements. The first one is there's no question of public nature, because that's the violation of 107, even though the underlying question is whether there's a violation of 107. But like I said, that doesn't concern the involuntary commitment. A second. Isn't it somewhat intertwined, because the problem here is even before she could have a hearing on the involuntary admission, they're administering medication and, you know, this electroconvulsive therapy to her. So can you really separate the two? I mean, wouldn't it be important for treatment providers to understand that you cannot, prior to admission, administer treatment unless you comply with 107A and this requirement that it be serious and imminent physical harm to the patient or someone else, and there's no alternative available that will work? Well, Your Honor, I think the answer is yes. I think, well, I'm sorry, the answer is no. I don't think, the two are completely separate. But with the involuntary commitment case, that was filed on June 18th. So there would not have been able to have a hearing. They would have had to give medication during that mid-time or between June 18th when she was admitted. Why? If they don't meet the standard of showing that it's an emergency? Well, Your Honor, at the... Is it your position that they can administer medication prior to the hearing even if they don't show that she's likely to cause serious and imminent physical harm to herself or someone else and that no alternative is available? Is that your position? No, Your Honor. That would have to comply. Everything would have to comply with the statute. At the time when she was committed, the doctor believed she was there even though he was wrong. But with the involuntary commitment case, she was, this happened, she was committed on June 18th. No, no, no. She was committed when? I mean, she was admitted, I'm sorry, on June 18th. Maybe admitted, but not committed. Right, correct. The commitment hearing and the medication hearing took place on the same day in July. Right, yeah, correct. I'm sorry. But the petition was filed on June 20th. So that's, the involuntary commitment case, and I don't know why, why, you know, the record doesn't reflect. I have no idea why they withdrew the petition. I just don't know. But with all those, with the involuntary commitment petition, as counsel said, you know, there was some reason they had an agreement. And she doesn't contest that. She's saying, you know, we have some sort of agreement with the state's attorney. You know, we don't matter. It doesn't matter with that case. But even though with the violation of 107, that just, even though, what I'm trying to say is that even though there was a violation, it doesn't matter with the involuntary commitment case. Okay, well, opposing counsel raises in her briefing here today, she's saying, well, if you're administering this medication to someone, you're altering, you know, their thought process. You're altering their body, you know, all of that. And so we really don't know what, if any, impact that had. And here we have a situation where all of this happened and these alterations took place before she even had the opportunity to be heard by the court on the admission. Well, Your Honor, I would say that she was already going through some of the medication before. Before she was even admitted to this, to Bro-Man Hospital. This, even if this were, even with that medication, these medications helped her at least somewhat. They helped her get better, you know. At the trial, the trial court ruled that these medications helped, you know, the risk was low for the respondent and they helped her get better. So are you saying that the means justified the end? Your Honor, I think the respondent here was in dire need of this medication. I don't think that necessarily the ends, you know, it means that. But when the respondent was, when she came in, the doctor ready, you know, he tried to do everything he could to do to help her. And even though, you know, there was a violation of 107, he was just trying to do the best thing he can possibly do for her. I don't think he was trying to force anything upon her. I just, the record speaks for itself, Your Honor. I really don't honestly know. I mean, I wasn't, you know, I wasn't counsel back then. And had I known, you know, I just don't honestly know. So, going back, Your Honors, with the second exception, obviously the first exception is proven. But the second, as I said, there must be substantial likelihood that this issue presented in this case would have some bearing on a similar issue. And it's the State's position that that is not met as well. The State does agree that case 366, and that's the ECT and medication, is not moot. However, as you've already heard, the respondent argues that it should be reversed for several reasons. I will begin with the ECT portion. She begins with, the respondent begins with that it's inherently prejudicial to enforce these kind of medications and ECT on the respondent. However, Your Honors, even though that the medication itself can be harmful, these medications are there so that they can help her. I mean, that's comparing like chemotherapy to, you know, any other medicine. It's there so they can get better. We understand the risk of chemotherapy or, you know, any other type of medication, yet we give it to them so they can get better. So, yeah, there might be some underlying side effect of, you know, risk or, you know, there can be death. But the whole point of these medications is to keep her alive, you know, at least to help her, you know, maintain her stability, her capacity to function as an adult. And with these kind of medications, even though they might do these side effects, they're there for a reason. That's why the statute was created, so they can give these kind of medications for this, for the respondent. But you agree that they administered this treatment without the court authorizing them to do so? In the beginning, yes, Your Honor. They did, they were, they thought there was an emergent need and based off that. Well, stop there. Dr. Reddy described an emergent need? That's what he thought. He said it was an emergent and that's not the standard, Your Honor. It's an immediate threat to oneself. How did he justify using that standard as opposed to what the statute requires? I don't think he ever did justify that, Your Honor. I don't think, I think he tried to say that, you know, she was in desperate need of stuff, but that's, I don't think, as the court found, or ruled, that that's not the standard that is in this, on these kind of cases. Did Dr. Reddy describe this as a practice of his? Do we know how prevalent this practice was, if it extended beyond this particular case? I wish I knew. I was talking to response counsel about that earlier before, and I wish I knew. I don't honestly know, and that's a question I would have for the hospital's counsel as well. Now, so overall, this issue does come down to the medication. Even though 107 wasn't violated, 107.1 wasn't. And that's the basis for the actual medications after she was committed. And the evidence clearly proved that 107.1, by clear and convincing evidence, was proven. But was it proven before she had treatment? No, Your Honor. It wasn't proven. That's what the statute requires, right? That requires, yes, and that's before the, before, yes, you're right, Your Honor, yes. But with at least 107.1, there was evidence that proved that she had a serious mental illness, that because of the serious mental illness, she had a deterioration of her ability to function. The medication, the ECTs that she did receive were, you know, outweighed any harm, and that those services were found explored and found inappropriate. The next issue comes down to the written documentation. The statute does state, and there's a case law that says that if there's no written information, it should be reversed. However, she did receive written documentation, although it was four days late. I don't know why Dr. Reddy didn't give her that day. From what I recall, she did get verbal, but you do need both. But as long as reversal is, when I'm talking about to reversal, it only requires reversal when there's no written documentation. She did receive this documentation. And I understand, you know, receiving it four days late might not look the greatest, but... It's really kind of the least of the problems here. Yes. But I think these medications helped the respondent, and I think that was evidence in the trial court where she said, you know, we don't want to harm the respondent, but, you know, we want to make sure her legal rights are there. So with that, we would ask this court to affirm cases 363 and 366. If there are no further questions. Thank you, Mr. Escalera. Ms. Schott, rebuttal. Thank you. I'd just like to address a few of the points raised by counsel. First of all, the late written info information. The purpose of written information under the law is to allow the person to give informed consent. And if you give the written information after the medication has been administered, it defeats the purpose. It has to be given before. It has to be given in written form. That's very clear, and that requires a reversal just on that. However, as Your Honor did state, that is about the least of the problems here, four days late. The problem here is what do we do as a society to mentally ill people? Counsel talked about we give chemo to help. People with cancer can refuse. They have the right to refuse chemo. They have the right to live their life however they want. They have the right to not have dangerous substances put in their bodies. Carol didn't have the ability to consent. So she has to rely on the law to protect her. And in this case, the law didn't. Because it was... I'm wondering, I mean, is there a culture of we know what's best for them, they don't, the unjustified means. I mean, is that the culture? Because this is very concerning. Yes, I think so. If you'd just excuse me a moment. This isn't an isolated incident. And that's because we don't go into other patients' treatments in our hearings. We haven't brought up other examples. However, the form that the doctor uses for the emergency treatment, he calls them emergent treatment, are preprinted. They're forms the hospital uses all the time to justify giving someone emergency medications. And as we stated in our brief, that document tracks the elements that are required to be proven under 107.1. The treatment part, not the emergency part of the mental health code. So they are thinking, well, if we think in our wisdom the person needs this treatment to make them feel better and to make them, to improve their life, or we're just going to see what happens, because sometimes it's a little of both, we can go ahead and do it because we have the best intentions. We have this form. We think that, you know, she lacks capacity. We think it'll help her. We think... And those forms were filled out every 24 hours, but they never justified an emergency. This is a practice at this hospital. The doctor made a quote in her chart on June 23rd, and I quote, I will continue to give her medications at my discretion and with consent from husband, as it is in her best interest to improve her functionality and quality of life. That is not the standard without a court order. That's a judge's determination. That's not Dr. Reddy's. And I note that had the people been given the continuance they asked for when this finally did come to hearing, she would have completed her entire round of the electroconvulsive therapy, and it never would have been a record, basically. That is correct, Dr. Reddy. That is correct. And that's why I refuse to allow that, to agree to that continuance. If you have no other questions, I see my time is up. Thank you, counsel. Thank you both. The case will be taken under advisement and a written decision shall be issued.